# EXHIBIT A

## OPERATING AGREEMENT

### FOR

## RAINBOW INTERNATIONAL HOLDINGS, L.L.C.

THIS OPERATING AGREEMENT (hereinafter referred to as the "Agreement") is made and entered into as of the ___31___ day of ___July_____, 1999, by and among CAPITAL ACQUISITIONS & MANAGEMENT COMPANY, an Illinois corporation ("CAMCO"), STEPHEN KOVACS ("Kovacs") and JOHN THOMAS ("Thomas"). CAMCO, Kovacs and Thomas are sometimes hereinafter collectively referred to as the "Members," who intending to be legally bound, agree as follows:

### ARTICLE 1
### ORGANIZATION

1.1    Formation, Name and Filings.  On the 22nd day of July, 1999 Kovacs, Thomas and CAMCO organized RAINBOW INTERNATIONAL HOLDINGS, L.L.C., a Florida limited liability company (the "Company") pursuant to the Act, as hereinafter defined. The Articles of Organization are hereby adopted and ratified by the Members. In the event of a conflict between the terms of this Agreement and the terms of the Articles of Organization, the terms of the Articles of Organization shall prevail. The business of the Company shall be conducted under the name of RAINBOW INTERNATIONAL HOLDINGS, L.L.C. or such other name as the Members may designated in writing. The Members agree to execute such certificates or documents and make such filings and recordings and do all other acts, including the filing or recording of alternate name(s) in the appropriate offices in the State of Florida as may be required in order to comply with all applicable laws. The Manager shall prepare and arrange for such filings and pay all appropriate filing fees out of Company funds.

1.2    Offices, Registered Office and Registered Agent.  The principal office of the Company shall be 4000 Hollywood Boulevard, Suite 485 South, Hollywood, Florida 33021. The Company may have such substituted and additional offices at such other locations situated in the State of Florida as the Members may, in their discretion, deem advisable. The Company's registered office shall be located at c/o Kramer, Green, Zuckerman, Kahn & Greene, P.A., 4000 Hollywood Boulevard, Suite 485 South, Hollywood, Florida 33021, and its initial registered agent shall be Mitchell F. Green. The Members may, within their sole and unrestricted discretion, change the principal office, registered office or registered agent of the Company, and establish additional offices of the Company.

1.3    Title to Company Property. Title to property to be acquired by the Company shall be in the name of the Company. The Manager shall execute such documents as may be necessary to reflect the Company's ownership of its property in such public offices in the State of Florida as may be required.

1.4    Commencement: Term. The Company shall commence on the date of the filing of the Articles of Organization and shall terminate in accordance with the Article 19 hereof.

1.5    Place of Business. The principal place of business of the Company shall be at 4000 Hollywood Boulevard, Suite 485 South, Hollywood, Florida 33021, Broward County, in the State of Florida and such other place or places as may be decided by the Manager.

1.6    Governing Law. The rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act, except as otherwise provided herein. The interest of the Members in the Company shall be personal property for all purposes.

## ARTICLE 2
## CHARACTER OF BUSINESS AND PURPOSES

The character of the business and the purposes of the Company shall be as follows:

2.1    In General.

2.1.1    The purpose of the Company shall be, among other things, to invest in and own shares, partnership and/or membership interests in corporations, partnerships and/or limited liability companies. The Company shall have all powers which are reasonable necessary to fulfill its purpose. The Company shall not engage in any business or activity outside the scope of its purposes without the majority vote of the Members.

2.2    Other Acts. The doing of any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of the business, objectives and purposes set forth in Article 2 hereof.

## ARTICLE 3
## DEFINITIONS

The defined terms used in this Agreement shall, unless the context otherwise requires, have the meaning set forth in this Article 3. Certain additional defined terms are set forth elsewhere in this Agreement.

3.1    "Act" shall mean the Florida Limited Liability Company Act, as now in effect or as hereafter amended or revised.

3.2    "Affiliate of a Member" shall mean any Person, corporation, partnership, trust, association or other entity which is controlled by, controls or is under common control with the Company, the Manager or other specified person, as the case may be, and includes,

-2-

without limitation, a Person's spouse, parents, lineal descendants and siblings, and parent companies and subsidiaries.

3.3    "Agreement" shall mean the operating agreement as originally executed and as hereinafter amended, modified, extended or supplemented from time to time.

3.3.1    "Available Cash from Operations" shall mean any cash received by the Company in connection with the ordinary operations of the Company business, less the sum of: (i) current operating and development expenses, including, without limitation, management and administrative expenses; (ii) Debt Service; and (iii) Reserves.

3.4    "Available Cash from Sale or Financing" shall mean any cash received by the Company in connection with the sale, exchange, other disposition, financing or refinancing of the Company property, less the sum of any amounts which must be paid as a result of or in connection with such sale, exchange, other disposition, financing or refinancing.

3.5    "Bankrupt" shall mean, with respect to any Member, the occurrence of any one or more of the following: (i) the making by the Member of an assignment for the benefit of creditors; (ii) the filing of an involuntary petition seeking an adjudication of bankruptcy under Chapter 7 of the Bankruptcy Code, which filing is not dismissed within sixty (60) days of the filing; (iii) the filing of a voluntary petition by the Member under Chapter 7 of the Bankruptcy Code; (iv) the filing of a voluntary or involuntary petition under Chapters 11 or 13 of the Bankruptcy Code which is not dismissed within sixty (60) days of the filing, but only if the Member is not the debtor-in-possession of his assets; (v) the entry of an order, judgment or decree by a court of competent jurisdiction providing for the liquidation of the assets of the Member or appointing a receiver, trustee or other administrator of the Member's assets which continues in effect and unstayed for a period of sixty (60) days; (vi) the confirmation of any plan of reorganization under either Chapter 11 or 13 of the Bankruptcy Code providing for the liquidation of substantially all of the Member's assets. For purposes of (iv) above, a Member shall not be considered a debtor-in-possession of his assets if a trustee, receiver or other person or entity is appointed to, or in fact does, control or operate the assets of the Member.

3.6    "Bankruptcy Code" shall mean Title 11 of the United States Code, as now in effect or as hereafter amended.

3.7    "Capital Account" shall mean, as to any Member, such Member's capital account, as provided in Article 4 hereof.

3.8    "Capital Contributions" shall mean the total amount of money and property contributed to the Company as provided in Article 4 hereof by the Members or any Member, as is applicable. The value of any property contributed to the Company shall be the fair market value on the date it is contributed to the Company.

3.9    "Capital Transaction" shall mean any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than

-3-

Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financing, refinancing, condemnations, and insurance proceeds for the destruction of assets used in the trade or business of the Company.

3.10    "Code" shall mean the Internal Revenue Code of 1986, as amended.

3.11    "Debt Service" shall mean all costs of obtaining and servicing indebtedness of the Company.

3.12    "Interest" shall mean the issued and outstanding shares of the capital stock of the Company, issued by the Company to the Members. The interest of the Members may be revised, from time to time, in accordance with this Agreement or pursuant to any other Agreement approved by the Members. The Initial Interest of the Members as of the execution date of this Agreement is as follows:

| Name/Member | Interest |
|---|---|
| Stephen Kovacs | 450 Shares |
| John Thomas | 450 Shares |
| CAMCO | 100 Shares |
| TOTAL | 1,000 Shares |

3.13    Majority, Member Interest of the Remaining Members shall mean the Remaining Members holding a majority of the Interest, excluding the Interest of the Selling Member, whose Interest shall neither be voted nor counted in determining the majority Interest of the Remaining Members.

3.14    "Manager" shall mean Kovacs.

3.15    "Members" shall mean Kovacs, Thomas and CAMCO and any person admitted as an additional or substitute Member in accordance with this Agreement in such person's capacity as a Member. The costs (including attorney's fees) associated with each Member's Interest shall be borne by each respective Member.

3.16    "Notice of Intent to Transfer" shall mean written notice by the Selling Member, which shall be mailed, by certified mail, or personally delivered, to the President of the Company (or other officer of the Company, in the event the Selling Member is the President of the Company) and the Remaining Members, which written notice shall set forth that the Selling Member desires to sell all of his Interest to a third party, pursuant to Section 11.1 hereof.

3.17    "Person" shall mean any individual, partnership, joint venture, corporation, trust, association, or other entity or organization.

-4-

3.18    "Proportionate Amount" shall mean that portion of the Interest not purchased by the Company, multiplied by an amount, the numerator of which is each of the Remaining Members' percentage Interest and the denominator of which is the aggregate percentage Interest of all of the Remaining Members.

3.19    "Regulations" or any abbreviation thereof shall mean the income tax regulations promulgated under the Code, as such regulations may be amended from time to time.

3.20    "Remaining Member" shall mean the Members, other than the Transferor Member or the Selling Member, as those terms are used in Article 11 hereof.

3.21    "Reserves" shall mean all Company reserves reasonably established for the Company by the Manager for Company purposes, including, but not limited to, accrued or deferred expenses and other working capital needs, improvements, repairs, contingent liabilities, taxes and purchases.

## ARTICLE 4
## CAPITAL CONTRIBUTIONS AND ACCOUNTS

4.1    Capital Accounts. Individual capital accounts for each Member ("Capital Accounts") shall be maintained and adjusted in the manner provided in Regulations Section 1.704-l(b)(2)(iv) or, if the Manager so elects, in accordance with any amended or successor regulations or authoritative interpretations issued thereunder.

4.2    Capital Contributions. Upon the execution hereof, the Members shall contribute the following sums to the capital of the Company:

| | | |
|---|---|---|
| Kovacs | — | $   300.00 |
| Thomas | — | $   300.00 |
| CAMCO | — | $10,000.00 |
| TOTAL | | $10,600.00 |

Additionally, Kovacs and Thomas have each contributed 5,000 quotas (shares) of Financial Management Control, Ltda., a limited liability company organized under the laws of Brazil.

4.3    Additional Capital Contributions, Loans and Guarantees.

4.3.1    Additional Capital Contributions. Except as provided in Article 4 hereof, no Member shall be required to make any additional Capital Contributions to the Company.

-5-

4.4     Limited Liability.  The Members shall not have any personal liability for liabilities or obligations of the Company except to the extent of their obligations in this Article 4 or as otherwise provided in this Agreement.  Notwithstanding the foregoing, (i) if any court of competent jurisdiction holds that distributions (or any part thereof) received by a Member pursuant to the provisions hereof constitute a return of capital and directs that a Member pay such amount (with or without interest thereon) to or for the account of the Company, or any creditor thereof, such obligation shall be the obligation of said Member and not of any other Member or the Company, and (ii) a Member shall indemnify and hold harmless the Company and each Member from any liability or loss incurred by virtue of the assessment of any tax with respect to such Member's allocable share of the profits or gain of the Company.

4.5     Interest on Capital Contributions or Right to Withdraw Capital Contributions. The Members shall not receive, or be entitled to receive, interest on their contributions to the Company capital or resulting balance thereon.  No Members shall be entitled to withdraw his/its capital contribution or to demand or receive a return of his/its contribution.

4.6     Use of Capital Contributions.  The aggregate of all the contributions to capital of the Company provided for herein will be available to the Company to carry out the purposes of the Company, including the organization and administration of the Company.

## ARTICLE 5
## PROFITS AND LOSSES

5.1     In General.  The Company's net income, gains and net losses shall be allocated either debited or credited to the Member's capital account in accordance with the Member's respective Interest.  "Net income" and "gain" means all items of Company income gained or credited, as determined for federal income tax purposes by the Company.  "Net losses" means all items of Company loss or deduction determined for federal income tax purposes by the Company.

## ARTICLE 6
## COMPANY FUNDS

6.1     In General.  All funds received by the Company shall be utilized for Company purposes as determined by the Manager in the best interests of the Company.  Until required for the Company's business, all Company funds shall be deposited and maintained in such accounts in such banks or other financial institutions as shall be selected by the Manager or shall be invested in securities of the United States government, certificates of deposit or money market funds designated by the Manager. The Manager or its designee, selected upon a majority vote of the Members, shall have the right to draw checks payable in such funds and make, deliver, accept and endorse negotiable instruments in connection with the Company's business. Company funds shall not be commingled with the funds of any other person.

## ARTICLE 7
## DISTRIBUTIONS

7.1     In General. Subject to all of the provisions of this Agreement, Available Cash from Operations shall be distributed to the Members at such times as such amounts are available for distribution, as reasonably determined by the Manager.

7.2     Distribution of Available Cash From Operations. Available Cash From Operations shall be distributed as follows:

7.2.1     Loans. First, to any Member, the amount then due on any loans, payable to each Member in the same ratio as the amount of the loans (including interest thereon) bears to the aggregate amount of unpaid loans outstanding to all of the Members (including interest thereon), at the time of such distributions.

7.2.2     Interests. Second, to the Members pro rata in accordance with their Interests.

7.3     Distribution of Available Cash From Sale or Financing. Available Cash from Sale or Financing shall be distributed as follows:

7.3.1     Loans. First, in the manner set forth in Section 7.2.1 hereof.

7.3.2     Interests. Second, to the Members pro rata in accordance with their Interests.

7.4     Priority and Distributions of Property. Except as otherwise provided herein, no Member shall have priority over any other Member either as to the return of capital or as to profits, losses or distributions.

## ARTICLE 8
## MANAGEMENT

8.1     Management and Control in General.

8.1.1     Except as set forth herein, the Manager shall have full power to manage and control the business and affairs of the Company, and the Members shall have no right to act on behalf of or bind the Company. The Manager shall have all the rights, powers and obligations of a manager as provided in the Act and as otherwise provided by law, and any action taken by the Manager shall constitute the act of and serve to bind the Company. In dealing with the Manager, no persons shall be required to inquire into, and all persons are entitled to rely conclusively on, the authority of the Manager to bind the Company.

8.1.2          Notwithstanding the provisions of this Section, the Manager shall not (i) confess a judgment against the Company or execute or deliver any assignment for the benefit of creditors of the Company or (ii) sell or assign substantially all the property in bulk of the Company, without the written consent of the Members holding a majority of the Members Interests.

8.1.2.1          <u>Extraordinary   Transactions</u>. Notwithstanding anything to the contrary in this Agreement, the Manager shall not undertake any of the following on behalf of the Company without the approval of a majority vote of the Members:

8.1.2.1.1          Any Capital Transaction.

8.1.2.1.2          Except as otherwise provided in Section 4.3.2 hereof, a loan in excess of $10,000.00 of the Company's monies on any one occasion.

8.1.2.1.3          The admission of additional Members to the Company.

8.1.2.1.4          Engaging in business In any jurisdiction which does not provide for the registration of limited liability companies.

8.1.2.1.5          The filing of a petition under the United States Bankruptcy Code or an assignment for the benefit of creditors.

8.1.2.1.6          The engagement of physicians to serve as Medical Director of the Center pursuant to a Medical Director Agreement.

8.1.2.1.7          Except as otherwise provided in Section 4.3.2 hereof, the borrowing of monies on behalf of the Company whether or not requiring a guaranty of the Members.

8.2          <u>Number and Appointment of Manager</u>. There shall be one (1) Manager of the Company, who shall be Kovacs.

8.2.1          The Manager may resign at any time upon ninety (90) days prior written notice to the Company or such notice as agreed upon by a majority vote of the Members. In the event of a vacancy in the position of Manager by reason of resignation, removal, death or Bankruptcy, a successor shall be appointed by the majority vote of all of the Members. In the event the Members fail to select a substitute Manager within sixty (60) days thereafter, the Company shall dissolve and liquidate.

8.2.1.1        If any one or more of the following events occurs, the Members may remove the Manager, and elect a new Manager:

8.2.1.1.1        The Manager's willful or intentional violation or reckless disregard of the Manager's duties to the Company; or.

8.2.1.1.2        The    Manager's involuntary withdrawal.

The determination of whether one or more of such events exist shall be made upon a majority vote of the Members and shall be final, binding, and not reviewable unless the decision was based on a material mistake of fact or law or was arbitrary and capricious.

8.2.1.2        Additionally, upon the unanimous vote of the Members, excluding the Manager/Member, the Members may remove the Manager and elect a new Manager.

8.2.2        Except as otherwise provided in Section 8.2, a Manager shall be required to be a Member of the Company.

8.3        Employment of Others, Including Affiliates. The Manager shall not be required to devote full time to the affairs of the Company and shall devote such time to Company affairs as they in its sole and unrestricted discretion deem necessary to manage and supervise the operations and business of the Company. Nothing contained in this Agreement shall preclude the employment by the Manager, on behalf of and at the expense of the Company, of themselves or any agent or third party to operate and manage all or any portion of the Company or to provide any service relating to the business, subject to the control of the Manager, upon the majority vote of the Members. The Manager may, on behalf of the Company, engage one or more Affiliates of the Manager to render services to the Company, provided that any such engagement shall be upon terms and conditions no less favorable to the Company than could be obtained from an independent third party. Neither the Company nor any of the Members shall have, as a consequence of the relationship created hereby, any right in or to any income or profits derived by the Manager or an Affiliate of any of the Manager from any business arrangements with the Company which are consistent with this Section.

8.4        Other Activities. The Manager, an Affiliate of any of the Manager and any Member may engage in or possess an interest in other business ventures or investments of any kind, independently or with others, including but not limited to ventures engaged in owning, operating or managing businesses or properties similar to those businesses or properties owned or operated by the Company. The fact that a Manager, any Affiliate of a Manager or any Member may avail itself of such opportunities, either by itself or with other persons, including persons in which it has an interest, and not offer such opportunities to the Company

or to a Member, shall not subject the Manager, the Member or such Affiliate to liability to the Company or to any other Member on account of lost opportunity. Neither the Company nor any Member shall have any right by virtue of this Agreement or the relationship created hereby in or to such opportunities, or to the income or profits derived therefrom, and the pursuit of such opportunities, even though competitive with the business of the Company, shall not be deemed wrongful or improper or in violation of this Agreement.

8.5     Meetings of Members and Voting. The Manager shall hold regular meetings at times and at places mutually agreeable to the Manager and at least one (1) meeting on an annual basis. Such meetings may be called and held telephonically or in person, and with no less than thirty (30) days notice, or upon such notice as required by law. Any Member shall also have the right to call a meeting of the Members. Such notice shall set forth the time and place of the meeting. If no place for the meeting is designated, the place of meeting shall be the principal office of the Company. Members holding at least a majority of all Member Interests shall constitute a quorum at any meeting of Members, whether present in person or by proxy. If a quorum is present at a meeting, the affirmative vote of Members holding at least a majority of all Member Interests shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization or by this Agreement. Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by a written consent describing the action taken, executed by each Member and delivered to the Manager(s) for inclusion in the Company records. Any action taken pursuant to this section shall be effective when all Members have executed the consent, unless the consent specifies a different effective date. When any notice is required to be given to any Members, a waiver thereof in writing executed by the person entitled to such notice, whether before, at or after the time stated therein, shall be equivalent to the giving of such notice.

## ARTICLE 9
## REIMBURSEMENT OF EXPENSES

9.1     Expenses.

9.1.1     The Manager shall be reimbursed for its out-of-pocket costs reasonably incurred in connection with the operations of the Company, including and not by way of limitation, travel expenses, i.e., airfare, hotel and meals, solely limited to such cost and expenses for travel that are incurred before the Center opens for business to the general public at standard commercially available published rates. The Company shall not reimburse the Manager or its Affiliates for their general office and administrative expenses or for compensation to its officers and employees.

9.1.2     The Company shall bear the expenses incidental to its formation. Each Member shall bear his/its personal expenses incurred in connection with the acquisition of his Member interest, except as otherwise expressly provided herein.

9.2·     Other Services. The Company may employ the Manager or its Affiliates and the Manager or its Affiliates shall be entitled to receive reasonable compensation for their services rendered in such capacity upon the majority vote of the Members.

## ARTICLE 10
## ACCOUNTING MATTERS

10.1     Books of Account. Books of account shall be kept by the Manager and proper entries therein of all sales, purchases, receipts, payments, engagements, transactions and property of the Company. The Manager shall proved financial information to the Members on an annual basis, which shall include a statement of operations, balance sheet and summary of check disbursements.

10.1.1     The Manager shall further keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to: (i) complete and accurate information regarding the state of the business and financial condition of the Company; (ii) a copy of the certificate of organization and operating agreement, all amendments to the certificate of formation and operating agreement, and all executed copies of any written powers of attorney pursuant to which the operating agreement, any certificate, and all amendments thereto have been executed; (iii) a current list of the names and last known business, residence, or mailing addresses of all Members and the dates they became Members; (iv) the Company's federal, state, and local tax returns; and (v) true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future.

10.1.2     The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Manager's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours and upon reasonable prior notice.

10.1.3     Any request for information shall be in writing, and shall state the purpose therefor. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records or the Company's production of information.

10.1.4     Within seventy-five (75) days after the end of each taxable year of the Company, the Manager shall cause to be sent to each Person who was a Member at any time during the accounting year ten ended: (i) an annual compilation report, prepared by the Company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountant; and (ii) a report summarizing the fees and other remuneration paid by the Company to any Member, the Manager, or any Affiliate in

-11-

respect of the taxable year. In addition, within seventy-five (75) days after the end of each taxable year of the Company, the Manager shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Member's income tax returns for that year.

10.2    Method of Accounting. All accounts of the Company shall be kept on the method of accounting selected by the Manager, and permitted by the Code, in its sole discretion.

10.3    Place of Records. The Company's books of accounts and all securities, papers, records and writings of the Company shall be kept at offices of the Manager at 10807 Whitehawk Street, Plantation, Florida 33324 or in such other place where the business may be carried on or as may be decided upon by the Manager. Each Member shall have free access at all times to examine and copy the books, papers, and other writings of the Company.

10.4    Fiscal Year. The fiscal year of the Company shall be the calendar year.

10.5    Tax Returns. The Manager shall cause to be prepared (at the Company's expense) income tax returns and appropriate state income tax returns, and cause to be furnished to each person who was a Member during the fiscal year a schedule of each such Member's share of profits and losses on the form then prescribed by the Internal Revenue Service. All elections and options available to the Company for federal or state income tax purposes shall be taken or rejected by the Company in the discretion of the Manager. The Manager shall have the right to prepare, or supervise and control the preparation of, all income tax returns of the Company.

10.6    Tax Matters Partner. Each of the Members hereby consent and appoint the Manager as the "Tax Matters Partner" of the Company, as that term is used in Sections 6221-6231 of the Code, and the Manager hereby agrees to act as such Tax Matters Member. The Company shall reimburse the Tax Matters Partner for any and all reasonable out-of-pocket costs and expenses (including reasonable attorneys' and other professional fees) incurred by it in its capacity as Tax Matters Partner. The Company shall indemnify, defend and hold the Tax Matters Partner harmless from and against any loss, liability, damage, cost or expense (including reasonable attorneys' fees) sustained or incurred as a result of any act or decision concerning Company tax matters and within the scope of the Manager's responsibilities as Tax Matters Partner, except for gross negligence or willful misconduct.

## ARTICLE 11
### TRANSFER OF MEMBERS' INTEREST

11.1    <u>In General</u>. In the event that a Member (the "Transferor Member") dies or if any of his Member Interests are subject to transfer by operation of law or are subject to an involuntary transfer to any person or entity, including, but not limited to, a Member's trustee in bankruptcy or state receivership, a Member's spouse incident to a divorce proceeding, a secured creditor, or a purchaser at any creditor or court sale (the foregoing events shall collectively be referred to as the "Terminating Event"), the Remaining Members shall purchase the Interest of such Transferor Member, in amounts proportionate to such Remaining Members' Interest in the Company, at the price and terms and consistent with the procedures set forth in Section 11.3 below. In the event a Member for any reason elects to sell his Interest in the Company or any portion thereof (the "Selling Member") to a third party, the Selling Member shall give Notice of Intent to Transfer, which Notice, pursuant to this Section 11.1 hereof, shall set forth the name of the third party which is the potential purchaser of the Interest, together with the price, terms and closing date for said sale. In such event, the Company and the Remaining Members shall have the option to purchase the Interest of the Selling Member.

11.2    <u>Procedure for Exercise of Option to Purchase Interest</u>.

11.2.1    Within thirty (30) days of receipt of the Notice of Intent to Transfer, pursuant to Section 11.1.1 hereof, a special meeting of the Remaining Members shall be called by such persons, as authorized in the Regulations, upon not less than ten (10) days no more than fifteen (15) days written notice to all of the Remaining Members. At such meeting, the Interest of the Selling Member shall be subject to an option to purchase, first by the Company and then by the Remaining Members, which option shall be exercised, if at all, at the time of such meeting or any adjournment date thereof not to exceed fifteen (15) days from the date of such meeting. The Company's option, if exercised, shall be exercised at such special meeting, upon the affirmative vote of the Majority Member Interest of the Remaining Members.

11.2.2    The affirmative vote of the Majority Member Interest of the Remaining Members, as set forth in Section 11.2.1 hereof, shall constitute the Company's exercise of its option, as provided in Section 11.2.1 hereof, to purchase the Interest of the Selling Member.

11.2.3    Any offer for sale of the Interest of the Selling Member to the Company or the Remaining Members must be for all of said Selling Member's Interest. If the Company or the Remaining Members shall exercise its or their option, as provided in Section 11.1 hereof, the Company or the Remaining Members shall purchase all of said Selling Member's Interest.

-13-

11.2.4      In the event the Company shall not exercise its option to purchase the Interest of the Selling Member, pursuant to its option contained in Section 11.1 hereof, the Interest not so purchased by the Company shall then be offered for sale and shall be subject to an option, on the part of each of the Remaining Members, to purchase a Proportionate Amount of said Interest. The Remaining Members' option shall be exercised, if at all, no later than fifteen (15) days from the expiration date of the Corporation's option to purchase said Interest. The Interest of the Selling Member not so purchased by the Remaining Members shall then be offered to those of the Remaining Members wishing to purchase same. Therefore, if the Interest of the Selling Member offered for sale are not purchased by the Remaining Members first entitled thereto, then in determining the Remaining Members' Proportionate Amount, the denominator shall not include the Interest owned by those of the Remaining Members which decline to purchase the Interest of the Selling Member.

11.2.5      Within thirty (30) days after the special meeting of the Remaining Members, the secretary of the Company shall provide written notice, which shall be mailed by certified mail, or personally delivered to the Selling Member of the action taken by the Company and/or the Remaining Members. The procedure described in this Section 11.2.5 shall serve as the Company's and/or the Remaining Members exercise of their option to purchase the Interest of the Selling Member.

11.2.6      The determination of the purchase price of such Interest, together with the terms for the payment of same, are set forth in Section 11.3 below.

11.3     Calculation of Purchase Price based upon Appraisal.

11.3.1      The term "Appraised Value" means the appraised value of the equity of the Company's assets as hereinafter provided. Within fifteen (15) days after demand by either one to the other, the Company and the withdrawing Member shall each appoint an appraiser to determine the value of the equity of the Company's assets. If the two appraisers agree upon the equity value of the Company's assets, they shall jointly render a single written report stating that value. If the two appraisers cannot agree upon the equity value of the Company's assets, they shall each render a separate written report and shall appoint a third appraiser, who shall appraise the Company's assets and determine the value of the equity therein, and shall render a written report of his or her opinion thereon. Each party shall pay the fees and other costs of the appraiser appointed by that party, and the fees and other costs of the third appraiser shall be shared equally by both parties.

11.3.2      The equity value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the value of the equity contained in the appraisal report of the third appraiser is more than the higher of the first two appraisals, the higher of the first two appraisals shall govern; and provided, further, that if the value of the equity contained in the appraisal report of the third appraiser is less than the lower of the first two appraisals, the lower of the first two appraisals shall govern.

-14-

11.3.3      Upon the purchase of the Selling Member's Interest, the Purchasing Members shall be obligated to the extent permissible, to obtain a release of the Selling Member from any and all loans owing by the Company as to which the Selling Member is obligated and to repay to the Selling Member (on a pro rata basis) any loans made by him to the Company. Upon such repayment, the Purchasing Members shall become entitled to repayment from the Company on the existing terms and conditions of the Selling Member's loan.

11.3.4      In the event of a purchase under this Article 11, the purchase price shall be paid beginning no later than thirty (30) days from the closing, in sixty (60) equal monthly installments, with interest thereon at the Citibank, N.A. prime rate then in effect at the time of the closing. Unless otherwise agreed by the parties, the consummation and closing of the purchase and sale of the Selling Member's Interest shall take place at the offices of the Company or by mail. Unless otherwise provided herein, the closing shall take place no later than:

11.3.4.1      Forty Five (45) days after the election of the Purchasing Members' purchase of the Interest of the Transferor Member or Selling Member, pursuant to Section 11.1 hereof; or

11.3.4.2      Fifteen (15) days after the calculation of the purchase price, as set forth in Section 11.3 hereof.

11.4      Purchase of Interest for Cause.  In the event that any Member (the "Terminating Member") shall fail to perform any of the material covenants, terms or obligations of this Agreement or shall be in breach of same (the "Breach"), the Members shall have a pro rata option to purchase the Terminating Member's Interest. The exercise of the foregoing option shall be pursuant to the procedures set forth in Section 11.1 hereof. The purchase price shall be the Terminating Member's proportionate share of the Net Book Value of the Company, as of the last day of the month prior to the month on which the Breach occurs. The term "Net Book Value" shall be determined in accordance with generally accepted accounting principles, applied on a consistent basis, using the cash method of accounting, without reference to good will, intangible assets and leasehold interests, if any, as determined by the certified public accountant then servicing the Company. The terms for payment of the purchase price shall be consistent with those set forth in Section 11.3 hereof and the closing for the purchase and sale of such Interest shall take place no later than ninety (90) days following the date of the Breach.

11.5      Interest Remains Subject to Agreement.  Each Member agrees that notwithstanding the provisions for transfer of any Interest contained herein, the Interest, when and if transferred, shall remain subject to all of the terms and conditions of this Agreement. As a further condition for a substituted or transferee Member becoming a Member in the Company, such substitute or transferee Member shall be required to execute a counterpart of

-15-

this Agreement, thereby agreeing to be bound by all of the terms, conditions and provisions contained in this Agreement.

11.6    Costs of Assignment. The cost of processing and perfecting an admission or assignment contemplated by this section (including reasonable attorneys' fees incurred by the Company) shall be borne by the party seeking admission as a Member to the Company.

11.7    Financing of Purchase Price. Notwithstanding anything contained in this Agreement to the contrary, at the discretion of the Members and on a case by case basis, if any part of the purchase price shall be financed, a Promissory Note shall be executed and as security for the payment of said Promissory Note, a Security Agreement, Escrow Agreement and UCC-1 Financing Statement shall be signed. The Security Agreement shall name the Interest being purchased as the collateral. The Interest shall be held in escrow by a mutually agreed upon escrow agent, or if the parties cannot agree, they shall be held with the Company's attorney, until such time as the Promissory Note is paid in full.

11.8    No Dissolution or Termination. In the event of the death of a Member or the transfer of a Member Interest, the Company shall not be dissolved or terminated and shall continue under its current name, except as otherwise provided in Article 11 hereof.

## ARTICLE 12
## TERMINATION AND LIQUIDATING DISTRIBUTIONS

12.1    Liquidation of Assets and Application of Proceeds. Upon the dissolution of the Company, the Manager shall liquidate and reduce to cash the assets of the Company as promptly as is consistent with obtaining the fair value thereof and apply and distribute the proceeds of such liquidation in accordance with the provisions of Section 7.3 hereof, by the end of the fiscal year obtained (or, if later, within ninety (90) days after the date of such liquidation).

12.2    Compliance with Timing Requirements of the Regulations. Upon liquidation of the Company (or any Member's Interest), liquidating distributions shall, in all cases, be made in accordance with the positive capital account balances of the Members, in compliance with Regulation Section 1.704-1(b)(2)(ii)(b)(2), as determined after taking into account all capital account adjustments for the taxable year during which such liquidation occurs by the end of such taxable year (or, if later, within 90 days after the date of such liquidation).

12.3    Deficit Makeup Provision. If any Member has a deficit balance in his Capital Account after allocation of gain or loss among the Members as provided in this Agreement, and after the payments and liquidating distributions specified above in this Article 12 have been made, such Member shall pay to the Company an amount equal to the amount of such deficit balance in his Capital Account by the end of the taxable year in which such liquidation occurs (of, if later, within 90 days after the date of such liquidation), in compliance with

-16-

Regulation Section 1.704-l(b)(2)(ii)(b)(3), and the Company shall use such deficit Capital Account balance payment first to pay amounts, if any, still owed to Company creditors and then to distribute the balance, if any, of such deficit Capital Account balance payment in repayment of any remaining positive balances in Members' Capital Accounts.

12.4      Liquidation Distributions to Trust. Notwithstanding the provisions of Article 14 hereof, in the event the Company is "liquidated" within the meaning of Regulation Section 1.704-l(b)(2)(ii)(g), in the discretion of the Manager, distributions that would otherwise be made to the Members pursuant to Sections 12.1 and 12.2 hereof, may be:

12.4.1      Distributed to a trust established for the benefit of the Members, for the purposes of liquidating Company Assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Members arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Manager, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; or

12.4.2      Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any Installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Members as soon as practicable.

## ARTICLE 13
## NAME AND GOODWILL

13.1      In General. Upon the complete termination and winding up of the affairs of the Company, the name of the Company and goodwill shall not be appraised, sold, or otherwise liquidated, without the approval of the Members.

## ARTICLE 14
## SUCCESSOR ENTITY

14.1      In General. Upon the approval of the Members, all or any part of the Company assets and liabilities of the Company may be transferred to a successor entity and the Manager may thereafter liquidate the Company and distribute shares of ownership in the successor entity to the Members as provided in Article 12 hereof.

## ARTICLE 15
## DISSOLUTION AND TERMINATION

15.1    Dissolution and Termination. Consistent with the provisions of Article 12 hereof, and in the event of any inconsistency herein, Article 12 shall control, the Company shall dissolve and be terminated on September 30, 2025, or upon the earlier happening of any one of the following:

15.1.1    Upon written agreement of Members holding a majority of the Members Interests;

15.1.2    Upon the sale of substantially all of the property or other conversion of substantially all the Company's assets to cash; or

15.1.3    Upon the occurrence of any other event other than one specified in this section which, under the Act or as otherwise provided by law, causes a dissolution and termination of the Company.

15.2    Liquidator.

15.2.1    Upon dissolution of the Company, the Manager(s), or if there is no Manager, such person as the Members holding a majority of the Members Interests may designate, shall act as liquidator of the Company (in either case, the ``Liquidator''). The Liquidator shall, with reasonable speed, wind up the affairs of the Company and liquidate the Property. The Liquidator shall have unlimited discretion to determine the time, manner and terms of any sale of Property having due regard to the activity and condition of the relevant market and general financial and economic conditions. The Liquidator shall distribute any proceeds received from the disposition of the property and any other assets of the Company in accordance with the provisions of this Agreement.

15.2.2    If any Member shall be indebted to the Company, then until payment of such amount by him, the Liquidator shall retain such Member's distributive share of property and apply the same to the liquidation of such indebtedness.

15.2.3    The Liquidator shall comply with all requirements of the Act and other applicable law pertaining to the winding up of a limited liability company, following which the Company shall stand liquidated and terminated, including the filing of a Certificate of Cancellation in the manner provided by the Act.

15.3    Source of Distributions. Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, the return of his capital contribution thereto and his share of profits or losses thereof, and shall have no recourse therefor (upon dissolution or otherwise) against any other Member or Manager.

## ARTICLE 16
## MISCELLANEOUS

16.1     Notices. All notices ("Notices"), including service of notices to arbitrate, consents and reports provided for in this Agreement shall be in writing and shall be deemed given on hand-delivery or on mailing by United States certified mail, return receipt requested, whether or not accepted by any party, at the addresses set forth below or at such other address as the Company or any of the parties hereto may hereafter provide by notice given in the manner Member provided in this Section:

To Manager/Member:              Stephen Kovacs
                                10807 Whitehawk Street
                                Plantation, FL  33324

With A Copy To: ·               Mitchell F. Green, Esq.
                                KRAMER, GREEN, ZUCKERMAN,
                                KAHN & GREENE, P.A.
                                4000 Hollywood Boulevard
                                Suite 485 South
                                Hollywood, Florida 33021
                                Tele: (954) 966-2112
                                Fax: (954) 981-1605

A copy of any notice, demand, consent or report to the Company by any Member shall be delivered to the other Members and the Manager in the same manner as provided in this Section for the giving of notices.

16.2     Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments, and to perform such additional acts as may be necessary or appropriate in the opinion of the Manager to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement, and all transactions contemplated hereby, including use of fictitious nature.

16.3     Construction. It shall be irrebuttably presumed that this Agreement was co-drafted by all signatories hereof and therefor this Agreement shall be construed without regard to any presumption or other rule requiring· construction against the party causing this Agreement to be drafted.

16.4     Interpretation. This Agreement and the rights and obligations of the respective parties hereto shall be governed and interpreted in accordance with the laws of the State of Florida. Venue for all lawsuits or other proceedings related to this Agreement or transactions therein described shall be commenced in a court of competent jurisdiction in the State of Florida.

-19-

16.5 Pronouns. All pronouns shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the entity or entities, or the person or persons may require.

16.6 Entire Agreement. This instrument contains all of the understandings and agreements of whatsoever kind and nature existing between the parties hereto with respect to this Agreement and the rights, interests, understandings, agreements and obligations of the respective parties hereto pertaining to the Company.

16.7 References to this Agreement. Numbered or lettered articles, paragraph and subparagraphs herein contained refer to articles, paragraphs and subparagraphs of this Agreement unless otherwise expressly stated.

16.8 Headings. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

16.9 Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, personal representatives, successors and assigns, including the provisions set forth in Article 18 hereof.

16.10 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.

16.11 Readjustment of Agreement on Invalidity. If any provision of this Agreement is declared invalid by any tribunal exercising competent jurisdiction, such provision shall be deemed automatically adjusted to conform to the requirements for validity, as declared at such time and, as so adjusted, shall be deemed a provision of this Agreement as though originally included herein.

16.12 Litigation Costs. In the event of any litigation arising by virtue of this Agreement, each party shall bear its/his own court costs, litigation expenses, and attorneys' fees at both trial and appellate levels.

16.13 Majority Vote. Majority vote shall mean fifty-one (51%) percent of the vote of all of the Members.

16.14 Changes in Interest; Issuance of Additional Interest. Notwithstanding anything contained in this Agreement to the contrary, the Company may redeem the Interest of any Member pursuant to the terms, conditions and provisions agreed upon by the Company (by a majority of the issued and outstanding shares of the Company) and the Member whose shares are being redeemed by the Company. Additionally, notwithstanding anything contained in this Agreement to the Contrary, the Company (upon the approval of the Members

-20-

owning a majority of the issued and outstanding shares of the Company) may enter into agreements with individuals or entities, including existing Members, pursuant to which the Company grants such individuals or entities with an option to purchase shares of stock of the Company, pursuant to the terms, conditions and provisions determined by the Company (by those Members owning a majority of the issued and outstanding shares of stock of the Company).

16.15    <u>Shares or Interest</u>. The terms "Interest" or "Shares" shall be synonymous and may be used interchangeably, with both terms describing the shares of stock of the Company issued and outstanding and owned by the Members.

### ARTICLE 17
### AMENDMENTS

This Agreement, except with respect to vested rights of a Member, may be amended at any time by a majority of the Member's Interest.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, as of the day and year first above written.

MEMBERS:

_____
Stephen Kovacs

_____
John Thomas

CAPITAL ACQUISITIONS &
MANAGEMENT COMPANY, an Illinois
corporation

By: _____
Print Name:  Eric Weldoff
Its:  President

K:\MFG\CAMCO\OPERAT1.AGT

-21-